United States District Court
District of Connecticut
FILED AT NEW HAVEN

February 9        .20 23

By    S. Santos

Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In the Matter of Search Warrant Applications for Two Electronic Devices | Case No. 3:23-mj-99 (MEG) **Filed Under Seal** |

## AFFIDAVIT

I, Ryan Halpin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices (collectively, the "Target Devices"), more fully described in Attachments A and C—which are currently in law enforcement possession, and the extraction from that property of electronically stored information, described in Attachments B and D.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.  I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the FBI since August 2019.  I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia.  I am currently assigned to the New Haven Division of the FBI, where I have been tasked with investigating violent criminal street gangs and organized criminal enterprises involving the smuggling, distribution, and sale of illegal drugs.  Prior to becoming an FBI Special Agent, I was a police officer for seven years. As

a police officer, I investigated numerous crimes, including drug dealing/distribution and firearms-related offenses.

3.      In connection with these investigations, I have coordinated controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in organized criminal activity; analyzed records documenting the purchase and sale of illegal drugs and other items; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by organized criminal enterprises.

4.      I have participated in previous Title III investigations, including by monitoring intercepted communications, completing extensive toll analysis, and conducting physical and electronic surveillance of investigative targets.

5.      Based on my training and experience, I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.  From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics.  I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones.  I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.  I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and

use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates.  For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply.

6. The facts in this affidavit come from my own personal knowledge from participating in this investigation and my training and experience, and from information obtained by me from other law enforcement personnel.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.  It sets forth only those facts necessary to support the requested authorization.

7. On or about January 10, 2023, I submitted an affidavit to the Court in support of applications to intercept wire and electronic communications over telephone number 646-889-3523 ("Target Telephone 6"), utilized by Markos PAPPAS. The application was granted by the Court that same day, the Honorable Kari A. Dooley, U.S.D.J. Wire and electronic communications were intercepted over Target Telephone 6 from approximately January 12, 2023 through this date.

8. I believe communications intercepted to date have revealed that PAPPAS and others engaged in drug trafficking.  Transcriptions of some of the calls intercepted to date are set forth below.  These transcriptions are in draft form.  They were prepared, in most instances, by monitors who first overheard, and if necessary translated, the intercepted calls.  The draft transcripts of intercepted communications are subject to revision. The same is true of draft transcriptions of consensually recorded conversations set forth herein.

9. As discussed more fully below, there is probable cause to believe, and I do believe, that Markos PAPPAS ("PAPPAS"), Lisa FAUSEL ("FAUSEL"), and other known and unknown individuals, have committed drug trafficking offenses in violation of Title 21, United States Code,

Sections 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances). There is also probable cause to believe, and I do believe, that evidence of those violations will be found on the Target Devices.

10.     Based on information known to me as a result of my participation in this investigation, as well as information provided to me by other law enforcement officers, I am familiar with the information discussed herein.   Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

11.     The first property to be searched, described in Attachment A, is a black iPhone 14, Verizon carrier, telephone number 203-916-3070, hereinafter referred to as "Device 1."   The second property to be searched, described in Attachment C, is a black/purple Motorola MC3AB, Sprint carrier, telephone number 203-449-4202,  IMEI 352304806952628, hereinafter referred to as "Device 2."   The Target Devices are currently located at the FBI New Haven Headquarters, 600 State Street in New Haven, Connecticut.

12.     The applied-for warrants would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachments B and D.

## PROBABLE CAUSE

13.     On January 18, 2023, during the course of the ongoing wiretap investigation, at approximately 12:50 p.m., PAPPAS made an outgoing call from Target Telephone 6 to an unknown male at 203-624-0525. While on hold during that call, PAPPAS stated, "Hey Siri, call CES Fred Blanck[,]" suggesting to investigators that PAPPAS was using another electronic device,

in addition to Target Telephone 6, to communicate. Investigators knew of a telephone number associated with an individual named Fred Blanck from the investigation. Investigators then subpoenaed the call detail records for the telephone number associated with Blanck and identified an incoming call to Blanck's telephone on this date at 12:50 p.m. from 203-916-3070 (i.e., Device 1). Investigators then subpoenaed for the subscriber information for -3070 and it came back to Markos Pappas of 41 Assumption Street in New Haven, Connecticut, activated in November 2022.

14.     According to toll records, on January 27, 2022, at approximately 10:37 a.m., toll records show that PAPPAS placed an outgoing call from Device 1 to Device 2, the number investigators determined to be used by Lisa FAUSEL. This call was 00:00 in duration because it likely did not connect. (In calls later that day intercepted over Target Telephone 6, PAPPAS referenced that Target Telephone 6 was inoperable earlier that morning because he forgot to pay the bill. Target Telephone 6 was reactivated at approximately 11:05 a.m.) After Target Telephone 6 was reactivated, PAPPAS used it to place an outgoing text message to Device 2 asking, "Good morning are you around" (Session 8574). Based upon my familiarity with the investigation and the events described below, I believe the call from Device 1 to Device 2 was likely drug related.

15.     FAUSEL, using Device 2, did not return PAPPAS' communications until January 29, 2023 at approximately 9:56 a.m. (Session 8752), when she texted Target Telephone 6, "Good morning Markos, I won't be back to the room till late or morning so tomorrow is good if you want to stop by..." From Target Telephone 6, on the same date at approximately 9:56 a.m., PAPPAS replied, "OK call me when you get back and I will swing by" (Session 8754). On January 30, 2023, at approximately 8:32 a.m., PAPPAS texted FAUSEL/ Device 2 from Target Telephone 6: "Ok gonna swing by be there in 20" (Session 8802). FAUSEL replied, "Ok,that's good. Then I'm going to sleep (laughing emoji)" (Session 8803). On this date at 9:21 a.m., the GPS location

coordinates from Target Telephone 6 place PAPPAS in Milford, Connecticut, where investigators had identified FAUSEL's motel. Based upon my familiarity with the investigation and the events described below, I believe these communications were to set up a drug transaction at the motel.

16.     On February 2, 2023, at approximately 9:04 a.m., PAPPAS placed a call on Target Telephone 6 (session 9202) to Device 2. PAPPAS asked, "Hey, sorry about that. I was on a jail call. I couldn't get off when you were calling . . . Alright, so I'm just calling . . . not to rush you or anything . . . I just wanna' know . . . uh, do you think it will be before 11 o'clock? . . . I wanna' know when I should be prepared for it." FAUSEL responded, "Shit, I don't know. I didn't hear from him. I was hoping it was gonna' be early, you know . . . you know what, let me find out." The two agreed to speak shortly.

17.     That same day at approximately 9:09 a.m., PAPPAS received a call on Target Telephone 6 from FAUSEL using Device 2 (Session 9205). The following conversation took place:

PAPPAS: Hello

FAUSEL: Hey Markos

PAPPAS: Hey

FAUSEL: We are all set

PAPPAS: Okay. You want me to head up?

FAUSEL: Yeah

PAPPAS: Okay, Thanks

FAUSEL: Alright. Okay bye.

18.     Previous intercepted conversations between FAUSEL and PAPPAS were of the same content, scheduling a time to meet. Based upon this history and the two calls intercepted on

the morning of February 2nd, investigators believed that PAPPAS was arranging to pick up a quantity of controlled substances from FAUSEL who, in turn, was waiting on someone to deliver them to her. FAUSEL then called PAPPAS to confirm that she had to drugs. Investigators had previously spoken to Devon Motel management and identified Lisa FAUSEL as staying in room number 12. Recent surveillance and Target Telephone 6 pings indicated that PAPPAS visited FAUSEL at this location on January 26 and 30, 2023.

19.     On February 2, 2023, investigators established stationary surveillance in the area of the Devon Motel prior to PAPPAS' arrival. At approximately 9:31 a.m., a grey Lincoln SUV bearing Connecticut registration BD01467, known to be driven by PAPPAS arrived at the Devon Motel. PAPPAS was observed exiting his vehicle and walking towards room number 12. Investigators could not see which unit PAPPAS entered based on the vantage points available.

20.     At approximately 9:51 a.m., PAPPAS was observed walking away from room number 12 with a paper bag in his hands. PAPPAS was not observed exiting a specific unit, however, he was observed exiting from an area which would have only been unit 11 or unit 12. PAPPAS entered his vehicle with the paper bag in his hands and left the area.

21.     PAPPAS' vehicle then entered the on-ramp for route 95 north. At approximately 10:01 a.m., PAPPAS' vehicle was stopped by a Connecticut State Trooper for a traffic violation in the area of exit 41.

22.     At approximately 10:32 a.m., Target telephone 6 received an incoming call from an unknown male using telephone 203-343-9080 ("UM9080"). The following conversation took place:

PAPPAS: Aight, I'm taking off

UM9080: You good?

PAPPAS: No. I'm 'bout to…I gotta go…where you at?

UM9080: I'm at the hotel

PAPPAS: Aight, I'ma come to the hotel and get you…you take me to the police station. I had a stop, then I took off. Uh…uh…I wasn't comfortable with how that was going. Um…I'ma pick you up, you take me to the police station. I turn myself in and [U/I]

UM9080: I got you

PAPPAS: And um… [Voices Overlap]

UM9080: I got you [U/I]

PAPPAS: Get the bondsman ready for me

UM9080: Aight, give me like two minutes.

PAPPAS: I'm right around the corner. I'm 'bout to come [Voices Overlap]

UM9080: I'm getting…I'm getting dress now.

PAPPAS: Aight

UM9080: Bye

23.     Investigators learned that PAPPAS fled from Connecticut State Police during the traffic stop ("…I had a stop, then I took off. Uh…uh…I wasn't comfortable with how that was going.") Investigators also believed that in the calls to UM9080, PAPPAS provided information as to where he was heading ("…I'ma come to the hotel and get you..") indicating that it was a "hotel." Investigators suspect that PAPPAS had drugs in the paper bag that he took from FAUSEL's room at the Devon Motel and further believe that PAPPAS fled the traffic stop to conceal those drugs and then turn himself in to police ("…you take me to the police station. I turn myself in.")

24.     On the same date at approximately 10:37 a.m., PAPPAS made an outgoing call from Target Telephone 6 to UM9080 (Session 9221), the following conversation took place:

UM9080: I'm done getting dressed up. [U/I] lobby in two minutes.

PAPPAS: I'm right here by your car.

UM9080: Alright

PAPPAS: Gotta gonna give you something real quick.

25.     I believe that PAPPAS called UM9080 to further advise that he had to give something to UM9080 prior to the UM9080 taking PAPPAS to the police station ("Gotta gonna give you something real quick.") I believe that PAPPAS was giving the drugs to UM9080 to conceal in UM9080's apartment prior to UM9080 bringing PAPPAS to the police station.  Pen and ping and Court-authorized GPS location information on Target Telephone 6 was received at 10:38 a.m., indicating that PAPPAS was in the area of 40 Sargent Drive in New Haven, Connecticut.

26.     Previously, on January 17, 2023,  PAPPAS and UM9080 engaged in a conversation (Session 7108) indicating that they were going to meet up. In the following call (Session 7110), PAPPAS indicated that he was at the "hotel" of UM9080, at the gate. Ping location information showed PAPPAS in the area of 40 Sargent Drive at that time. Physical surveillance did not locate PAPPAS during this short visit, but did observe an apartment complex to have a gate and be within the ping location area. This complex is the New Haven Village Suites, located at 3 Long Wharf Drive in New Haven.

27.     Investigators responded to the area of the New Haven Village Suites on this date in anticipation of PAPPAS fleeing to that area. Investigators observed PAPPAS' vehicle, unoccupied. At approximately 10:48 a.m., investigators at this location observed PAPPAS in the

parking lot having come from an unknown apartment. PAPPAS entered a vehicle with two other individuals, one of who was recognized by investigators as Julio Echevarria. Law enforcement personnel were able to stop the Jeep and detain PAPPAS until he was taken into custody by Connecticut State Police for fleeing the traffic stop.  PAPPAS exited the Jeep while talking on a cellular device. PAPPAS ended his call and placed the cellular device on top of the Jeep. An investigator on scene called 203-916-3070 and observed this device ringing, confirming it to be the device belonging to PAPPAS. This device was seized at that time.

28.    Investigators on scene at the New Haven Village Suites observed the historical surveillance video footage for this location in attempt to determine the unit number that PAPPAS entered and exited. The surveillance footage showed PAPPAS initially ascending the stairs that leads only to apartment 321 and apartment 322. PAPPAS is then observed on the surveillance footage, several minutes later, exiting down those same steps just prior to investigators observing him in the parking lot. Management at this location confirmed that Julio Echevarria lived in unit 322.

29.    Based upon the calls set forth above and the actions of PAPPAS on February 2nd, investigators believe that PAPPAS brought the drug quantity from his vehicle to this apartment. PAPPAS was not observed carrying anything when he went into the apartment, however, investigators know that quantities of drugs could be concealed within one's clothing, especially because PAPPAS was wearing a large sweatshirt with a hood.  A West Haven Police Department K-9 trained in detecting illegal narcotics was then brought to the New Haven Village Suites, was run around the perimeter of PAPPAS' vehicle, and then alerted to the presence of narcotics on the pillar between the driver side front and rear seats.

30.     Later on February 2, 2023 around 12nn, investigators went to Room 12 of the Devon Motel and knocked on the door. Lisa FAUSEL answered the door and invited the investigators to come in the room, after investigators identified themselves as law enforcement. FAUSEL stated that "Markos" just left her room and that he took a paper bag that he had dropped off to her several days earlier. FAUSEL stated that the bag was kept in a Styrofoam cooler with nothing else. FAUSEL claimed that she did not know what was in the paper bag. FAUSEL allowed agents to take the Styrofoam cooler outside of the room, which investigators did. A West Haven Police Department K-9 trained in detecting illegal narcotics was then brought to the motel and alerted to the presence of narcotics on the container. Based upon my training and experience, I understand that K-9 alerts can be to residue left when drugs are removed from a container like a cooler. FAUSEL declined to allow investigators to search Room 12.

31.     Based on these circumstances, search warrant applications were presented to the Court for FAUSEL's motel room, Echevarria's apartment and PAPPAS' vehicle. On February 3, 2023, the Court, the Hon. Maria E. Garcia, United States Magistrate Judge,  issued the three search warrants.

32.     The Court-authorized search of FAUSEL's hotel room revealed a kilogram of a white powdery substance, which field-tested positive for cocaine, approximately $85,000 cash, and two clear plastic bags containing hundreds of blue pills. Based on my training and experience, I recognized these pills as resembling Oxycontin. Investigators suspect the pills to be counterfeit pills containing fentanyl based on their non-uniform appearance and experience in this investigation. Investigators also seized Device 2 after calling the number (203-449-4202) used by FAUSEL to communicate with the wiretapped phone, Target Telephone 6, and observing Device 2 ring. Following the search of the motel room, FAUSEL was advised of her *Miranda* rights,

agreed to speak with agents, and was interviewed.  She again reiterated that she did not see what was in the brown paper bag with which PAPPAS left her hotel room, but she suspected it to be "drugs."

33.    The search of Echevarria's apartment did not reveal any contraband. The search of PAPPAS' vehicle yielded suspected drug residue in the center console area, which tested positive for the presence of fentanyl.

34.    I believe, based upon my training and experience and familiarity with this investigation, that PAPPAS uses Device 1 and Target Telephone 6 interchangeably, without having a set designation for either device to separate criminal activity from non-criminal activity. For example, as described above, when Target Telephone 6 was turned off on January 27, 2023, PAPPAS used Device 1 to reach out to FAUSEL. Similarly, on January 21, 2023, at 2:18 p.m., PAPPAS made an outgoing call from Target Telephone 6 to an unidentified male at telephone number 203-298-2003. During the call, PAPPAS instructed the male: "All right so call my iPhone when you get in there, 'cause I don't hear this one, but I got my watch on so I'll feel it ringing[,]" which indicates that he uses the two devices simultaneously and interchangeably.  In addition, on February 2, 2023, shortly after fleeing from police, PAPPAS used target Telephone 6 to call Echevarria to arrange to drop the suspected drugs off to him, while officers also saw him talking on the phone that was later identified as Device 1, likely discussing with others his ongoing flight from law enforcement.  A review of toll records for Device 1 confirms this belief: for example, on January 19, 2023, at 12:37 p.m., PAPPAS received a text on Device 1 from telephone number 203-343-9080, used by Julio Echevarria. Therefore, like the communications over Target Telephone 6, I believe the telephone logs, text messages, and other stored communications to/from Device 1 will reveal information into PAPPAS's drug activities.

35.     I also believe that Device 2 will contain evidence of FAUSEL's illegal activities. First, the phone likely contains evidence of who uses/ controls the phone, which will confirm that PAPPAS was speaking with FAUSEL when he communicated with that phone. The phone will likely contain evidence demonstrating FAUSEL and PAPPAS's control/ownership of the drugs and cash seized from FAUSEL's motel room on February 2, 2023. In addition, the phone will likely contain evidence as to the identity of "him," the person referenced by FAUSEL on February 2, 2023 when PAPPAS asked her if she was ready for him (Pappas) to come over to the motel, presumably to pick up the drugs.

36.     In conclusion, based on the aforementioned communication, physical surveillance, and seizures of evidence, I believe that the Target Devices are being used to communicate with others regarding illegal activities, in particular, the illegal purchase and sale of narcotics. Accordingly, there is probable cause to believe and I do believe that the information in the Target Devices will contain evidence of violation of federal law to include violations of the Target Offense.


### TECHNICAL TERMS

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

A.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

B.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

C.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

D.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

38.     Based on my training and experience, as well as the manufacturer's advertisements and product technical specifications available online, I know that the Target Devices likely have capabilities that allow it to serve to as a wireless telephone, digital camera, portable media player, and GPS navigation device. Due to the exact model of each cellular telephone not identified without additional access to the device, the exact capabilities of the devices are uncertain. In my

training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.     Based on my knowledge, training, and experience, and consultation with and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

40.     *Forensic evidence.*  As further described in Attachments B and D, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

> E. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
>
> F. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
>
> G. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
>
> H. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

I. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant.  Examination of the Target Devices may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Devices to human inspection in order to determine whether it is evidence described by the warrant.

42.    *Manner of execution.*    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device 1, described in Attachment A, to seek the items described in Attachment B, and the examination of Device 2, described in Attachment C, to seek the items described in Attachment D.

Respectfully submitted,

RYAN
HALPIN

Digitally signed by RYAN
HALPIN
Date: 2023.02.09
10:14:43 -05'00'

Ryan Halpin
Special Agent
Federal Bureau of Investigation

The truth of the foregoing affidavit was attested to me by telephone by Special Agent

Ryan Halpin this 9th day of February 2023.

Maria E.
Garcia

Digitally signed by Maria
E. Garcia
Date: 2023.02.09
14:06:10 -05'00'

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is a black Apple iPhone 14 cellular telephone, Verizon carrier, telephone number 203-916-3070, seized from Markos PAPPAS during a probable cause arrest on February 3, 2023 ("Device 1").  Device 1 is currently stored at the FBI New Haven Headquarters, 600 State Street, New Haven, Connecticut.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on Device 1 described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances) (hereinafter the "Target Offense") involving Markos PAPPAS, for the time period of December 1, 2022 through February 3, 2023, including:

    a. The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

    b. Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

    c. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

    d. Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e. Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g. Saved searches, locations, and route history in the memory of the Device; and

    h. Internet browsing history, including internet searches in the memory of the Device.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

## **ATTACHMENT C**

The property to be searched is a black/purple Motorola MC3AB cellular telephone, Sprint carrier, telephone number 203-449-4202, IMEI 352304806952628, seized during a reasonable suspicion interview from person of Lisa FAUSEL on February 2, 2023 ("Device 2"). Device 2 is currently stored at the FBI New Haven Headquarters, 600 State Street, New Haven, Connecticut.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment D.

## ATTACHMENT D

All records on Device 2 described in Attachment C that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances and Conspiracy to Possess with Intent to Distribute Controlled Substances) (hereinafter the "Target Offense")  involving Lisa FAUSEL for the time period of December 1, 2022 through February 3, 2023, including:

   a.  The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

   b.  Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

   c.  Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

   d.  Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

   e.  Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

   f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

   g.  Saved searches, locations, and route history in the memory of the Device; and

   h.  Internet browsing history, including internet searches in the memory of the Device.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.